UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHN J. MUELLER,                    )
                                    )
        Plaintiff,                  )
                                    )
        v.                          )       No. 4:05CV748 CDP
                                    )
JO ANNE B. BARNHART                 )
Commissioner of Social Security     )
                                    )
        Defendant.                  )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §405(g) for judicial review of the

Commissioner's final decision denying Plaintiff John J. Mueller's application for

disability insurance benefits under Title II of the Social Security Act (the "Act"), 42

U.S.C. §§ 401 et seq. and supplemental security income benefits under Title XVI of

the Act, 42 U.S.C. §§ 1381 et seq.  Mueller claims that he is disabled because he

suffers from major affective disorder, bipolar disorder, somatization disorder,

personality disorder, depression and various physical ailments.  The Administrative

Law Judge, while recognizing that Mueller has a severe impairment, found that he

was not disabled.  Because I find that the decision denying benefits was supported

by substantial evidence, I will affirm the decision.

1

## Procedural History

On July 3, 2003, Mueller filed applications for Disability Insurance Benefits and Supplemental Security Income pursuant to Titles II and XVI of the Act. Mueller alleged disability since January 28, 2003 due to pain in both shoulders, a prior left elbow injury, a hiatal hernia on the left side of his stomach, bone problems, as well as being generally depressed and mentally tired. On August 14, 2003, after Mueller had missed a scheduled consultative examination and failed to complete a Work History Report, the application was denied for failure to cooperate. On September 10, 2003, Mueller filed a Reconsideration Disability Report where he stated his depression had worsened and additionally added a torn rotator cuff and hip problems to his physical ailments. Mueller requested a hearing, which was held on March 4, 2004. The ALJ determined that, while Mueller was limited in his ability to do basic work activities, he was not disabled. On March 25, 2005, the Appeals Council denied Mueller's request for review. Thus, the decision of the ALJ stands as the final determination of the Commissioner.

## Evidence Before the Administrative Judge

Mueller was 35 years old at the time of the hearing. He graduated from high school in 1988 with a B average. Mueller had held a variety of positions since graduating high school including working as a nurse's aide, laborer, landscaper and

car detailer.

Mueller testified that starting in 1995 his inability to get along with others, including his supervisors and co-workers, led to his being fired from many different jobs. Over time this has increased his depression and anxiety in finding, working and keeping any job. This feeling culminated in what Mueller described as a nervous breakdown in September 2000. Mueller was not hospitalized for the period following his breakdown, but he stated that he could not leave his house or open his windows for one year. Mueller was eventually able to return to work after this breakdown.

Mueller testified that he does not need to see a psychiatrist or even a counselor for these problems. Further, he denied that any of the physicians he had seen suggested that he should seek further help for his psychological problems. Mueller testified that his family doctor, Dr. Rau has prescribed medication which had helped some of his symptoms for depression. However, Mueller stated he can no longer work because of the stress and anxiety that finding, working and keeping a job would entail.

While Mueller acknowledged his psychological problems, both his testimony and disability report emphasized his physical symptoms. Mueller testified that he suffered from several physical symptoms including: pain in both shoulders, lateral

epicondylitis (tennis elbow), a hiatal hernia on the left side of his stomach, bone problems, degenerative joint disease, a torn rotator cuff, left collarbone pain, back pain, and hip problems. Mueller testified that his physical problems started in 1988 at his first job in a nursing home where he pulled his back. Mueller testified that he still experiences pain and weakness in his back. As an example, Mueller stated that at a time shortly before the hearing, he had pulled his back out for three days after trying to move a twelve-pack of soda while grocery shopping.

Mueller testified that he injured his elbow in 1997 when he hit the back of a trash truck with his elbow. Mueller testified that this injury required him to have surgery to repair bone fragmentation and ligament damage. Mueller testified that after Dr. Sedwick operated on his elbow, he returned to work too quickly and pulled his rotator cuff trying to compensate for the elbow injury. In his disability report, Mueller stated that these injuries have led to difficulty in lifting objects. Mueller stated that he is able to lift a 20-25 pound sack of dog food and can carry it a short distance.

In June of 2003, while working as a landscaper, Mueller fell and hit his left collarbone. As he did not have any medical insurance, Mueller did not seek any medical attention even though he thought he had cracked the bone. Mueller stated that his collarbone is still in continuous pain which feels similar to arthritis.

In addition to these work-related injuries, Mueller testified that his calves are higher than normal for someone of his stature. He testified that this has led to degenerative joint disease in his knees, which has especially affected his right knee. Mueller testified that this pain has caused a change in his ability to walk. He stated that he no longer can place his body weight on either leg for fear that his knee will give out. He estimated that he can walk for around half an hour at a time. Mueller also stated that this illness has spread to his hips. As a result his hip pops in and out of place on a regular basis. Further, Mueller testified that this arthritic pain has spread to his hands. Mueller stated that the arthritis in his hand is so severe that even a non-strenuous activity such as holding a steering wheel while driving a short distance will cause his hands to cramp up.

In addition to his bone problems, Mueller stated that he has a hiatal hernia. Mueller testified that when he has an attack, he has severe abdominal pain. Mueller compared this pain to being stabbed under the ribs. Mueller stated that he had suffered from this symptom sporadically over the last ten years. Mueller acknowledged, however, that he had not had an attack for quite a while previous to the hearing.

Mueller testified that these psychological and physical problems make it difficult for him to perform everyday tasks such shopping at the grocery store.

Nonetheless, he is able to adequately groom himself and live on his own. He is also able to feed, walk and take care of two puppies he owns.

## Medical Records

Mueller has complained of several physical ailments over the last ten years. In 1997, Mueller was examined by Dr. Rau, a general practitioner, after hitting his left elbow on the back of a trash truck. Dr. Rau diagnosed the injury as lateral epicondylitits. When Mueller's condition did not improve, despite steroid treatment and plenty of rest, Dr. Rau referred Mueller to an orthopedist. The medical records of that examination were not included in the record, although Mueller has stated that his elbow was operated on by the orthopedist, Dr. Sedwick.

On July 12, 1999, Mueller complained of abdominal pain and stated that he had been vomiting blood. He was admitted to the Emergency Room of St. John's Mercy Hospital, where a gall bladder/bilateral tract was performed. The exam was somewhat limited but did not find anything irregular. The same day a barium swallow and upper GI examination was performed. These tests did find a small sliding type of hiatal hernia. The stomach was otherwise normal and no evidence of any complications related to the hiatal hernia, such as ulcers, were found.

Over the next six years, Mueller visited Dr. Rau several times complaining of his abdominal pain. Despite treating the hiatal hernia, and the heartburn-like

symptoms it generally causes, with Prevacid and Nexium, no cure for Mueller's pain was found. On April 16, 2001, Mueller was again admitted to St. John's Mercy Hospital for abdominal pain. A CT examination of the abdomen was performed. The CT found nothing which would explain the severity of Mueller's symptoms. Some of Mueller's abdominal pain is caused by his hiatal hernia. The cause of the severity of the symptoms that he described, however, was not medically determinable.

Mueller has also complained of pain in his hands, general bone pain and shoulder discomfort. In an examination on November 24, 2003, Dr. Rau did not find any signs of tenosynovitis (trigger finger) which would explain the pain in his hands. Blood tests showed a normal sedimentation rate, which indicated no inflammation of his joints. The blood test also was negative for rheumatoid arthritis. Dr. Rau noted that it was unclear why Mueller was experiencing all of these symptoms.

As part of his application for disability benefits, the Division of Family Services ordered Mueller to undergo a psychiatric consultative examination. Dr. Georgia Jones performed this examination on September 29, 2003. She noted that Mueller was clean but not fixed up and appeared to have a blunted affect to his appearance. She noted that Mueller's ability to care for his personal needs was

diminished. During her discussion with him Mueller had a "decreased speed, quantity, quality and productivity to his speech." However, Mueller did not appear to have any problem with the content of his thought, such as hallucinations, perceptual disorders or delusions. Nor did Mueller have any difficulty answering questions requiring short term memory use and performing simple calculations. Dr. Jones concluded that Mueller could manage his own funds and understood the meaning of filing for benefits. In terms of Mueller's ability to function socially, Dr. Jones noted that Mueller had a diminished capacity to deal with other people. Dr. Jones concluded that Mueller suffered from major affective disorder, bipolar disorder, most recent episode mixed, severe with some psychotic features. She concluded that Mueller's GAF score was 45-50 with a guarded prognosis. A GAF of 41-50 typically indicates "[s]erious symptoms...or any serious impairment in social, occupational, or school functioning..." Am. Psychiatric Assoc., <u>Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)</u>, 34 (Text Revision 4th ed.2000).

In an examination on November 24, 2003 to treat Mueller's bone pain, Dr. Rau also noted one of Mueller's symptoms as bipolar disorder. Dr. Rau's later notes indicate that this diagnosis came from Dr. Jones. Dr. Rau recommended that Mueller consider psychiatric treatment for his Bipolar Disorder. After Mueller

refused to consider this, Dr. Rau prescribed a trial of Paxil to treat Mueller's bipolar disorder. One month later, Dr. Rau switched the medication from Paxil to Depakote to treat his symptoms

Mueller followed up with Dr. Rau on February 5, 2004. Mueller asked Dr. Rau to write a letter in support of his disability claim. While Dr. Rau told Mueller he would support him, he stated that he felt Mueller's claim was dependent on his psychological evaluation and not his physical symptoms. Dr. Rau noted that Mueller had stopped taking Depakote because he stated that the drug caused him to have memory loss. Dr. Rau started Mueller on samples of Lexapro, to treat his depression and generalized anxiety disorder.

Following his hearing, Mueller was referred to a clinical psychologist, Dr. Joseph Long, for a psychological consultative examination, performed on April 29, 2004. Dr. Long described many of Mueller's characteristics in a way similar to Dr. Jones. For instance, Dr. Long noted that Mueller appeared clean and adequately groomed. Dr. Long also found no problem in Mueller's memory or ability to perform simple calculations. Finally, Dr. Long found no problem with the content of Mueller's thought, such as hallucinations, delusional ideations or extreme emotional liability. Dr. Long concluded that Mueller's intelligence was in the low average range, and that his thought process was pressured, scattered and highly

opinionated.

Mueller told Dr. Long several times that he had been diagnosed by Dr. Jones previously, specifically pointing out the GAF score she had assigned him. Mueller stated that he had taken several psychotropic medications while under the supervision of his family physician, Dr. Rau. However, Mueller told Dr. Long that he had stopped taking these drugs. Mueller emphasized that he was not psychotic or suicidal and that he did not think he needed any psychological treatment.

Dr. Long then performed a Minnesota Multiphasic Personality Inventory-2 (MMPI) examination. Dr. Long found that Mueller's responses showed elevation on the L validity scale. Individuals with this feature generally are excessively rigid, defensive, self-centered and compromising. Further, those individuals tend to deny unfavorable traits in themselves and have very limited personal insight. Dr. Long also created a clinical profile, which showed elevations on Scales 1-3-2. Individuals in this range generally have a "long history of insecurity and immaturity and tend to develop somatic concerns under increasing demands and stress." These somatic concerns would explain the several physical symptoms Mueller stated he was experiencing, which have no determinable organic basis. Generally, these individuals are prone to excessive worry, cognitively rigid and unduly sensitive to criticism, making them uncomfortable with other people. The excessive worry tends

to cause high levels of anxiety.  Dr. Long found the MMPI results and the clinical profile to be consistent with each other.

Dr. Long's conclusions differed from Dr. Jones'.  Dr. Long concluded that Mueller suffered from somatization disorder, anxiety disorder (nonspecific), personality disorder (with dependent and paranoid features), marijuana abuse and probably ADHD.   In terms of Mueller's specific functional limitations, Dr. Long completed a  "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" report.  Dr. Long concluded in this report that Mueller had no impairment in his ability to understand, remember and carry out simple instructions and that he was only slightly impaired if given detailed instructions.  Further, Mueller had only a slight impairment in his ability to make judgments on simple work-related documents.  Within the area of interaction with others, Dr. Long found that Mueller was only moderately impaired in all aspects including: his ability to interact with the public, supervisors, co-workers, and his ability to respond appropriately to work pressures and changes in a routine work setting.  Dr. Long found that Mueller tended to overreact in these situations and use somatic problems as a way of escaping from these pressures.

## Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Gowell v. Apfel, 242 F.3d. 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, Id. , or because the court would have decided the case differently. Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)(quoting, Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)). To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider: (1) the credibility findings made by the Administrative Law Judge; (2) the education, background, work history, and age of the claimant; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints relating

to exertional and non-exertional impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question. Brand v. Secretary of Dep't. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the Act as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). In determining whether a claimant is entitled to benefits on the basis of disability, the Commissioner must evaluate the claim using a five-step procedure. 20 C.F.R. §§ 404.1520, 416.920.

First, the Commissioner must decide whether the claimant is engaged in substantial gainful activity. If the claimant is engaged in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe, medically determinable, impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner will review the application further to see if that impairment meets, medically equals, or functionally exceeds those set forth in the "Listing of Impairments" contained in 20 C.F.R. pt. 404, subpt. P, app. 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the claimant does not have such an impairment, the Commissioner reviews whether the impairment prevents the claimant from doing past relevant work. Past relevant work is substantial gainful activity that lasted long enough for the claimant to learn it and was performed in the last 15 years. 20 C.F.R. §§ 404.1520(d); 20 C.F.R., pt. 404, subpt. P., app.1. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If the claimant has met the burden of production and persuasion for the first four steps of this process, the burden of production shifts to the Commissioner to prove that other work which the claimant can perform is available in the national economy. If the Social Security Administration cannot meet this burden, the Commissioner declares the claimant disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

When evaluating evidence of pain or other subjective complaints, the Commissioner is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness and side effects of any medication; and (6) the claimant's functional restrictions.

Id. at 1322.

A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. Singh, 222 F.3d at 451. A treating physician's opinion concerning a claimant's impairment will be granted controlling weight, if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

Id.  While a treating physician's opinion is usually entitled to great weight, it is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir.1996). The Eighth Circuit has upheld an ALJ's decision to reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole. Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir.1995).  In any event, whether the ALJ grants a physician's opinion substantial or little weight, the regulations require the ALJ to "always give good reasons" for the particular weight the ALJ chooses to give the opinion.  Singh, 222 F.3d at 452; Prosch, 201 F.3d at 1013; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

## The ALJ's Findings

The ALJ found that Mueller was not disabled, considering his age, education, work experience and residual functional capacity.  However, the ALJ found that Mueller does have a somatoform disorder, a personality disorder and in 1997 experienced an episode of lateral epicondylitis, all of which limit his  physical and mental ability to do basic work activities.  The ALJ concluded that these limitations do not meet, medically equal or functionally exceed an impairment listed in 20 C.F.R. pt. 404, subpt.  P, app. 1.

The ALJ gave Dr. Long's medical report greater weight than Dr. Jones'. Further, the ALJ found that Mueller's allegations were not entirely credible and conflicted with the medical evidence. The ALJ concluded that Mueller could perform medium work as long as: (1) it is relatively low stress work; (2) it does not require more than occasionally interacting with coworkers, supervisors or the public; and (3) it does not require the lifting or carrying of more than 50 pounds occasionally, or (4) it does not require the lifting or carrying of more than 25 pounds frequently.

Further, the ALJ found that these limitations do not prevent Mueller from performing his past relevant work as a landscaper or car detailer. Additionally, the ALJ found that Mueller's residual functional capacity allow him to perform a significant number of jobs in the local and national economy. The ALJ concluded that Mueller was not under a disability at any time prior to his decision.

## Discussion

On appeal, Mueller argues that the ALJ did not properly consider the medical evidence. Mueller contends this led the ALJ to err at step three of the analysis, by failing to find that Mueller satisfied the Commissioner's Listing requirements under

20 C.F.R. pt. 404, subpt. P., app. 1, §12.04[1].  Mueller also contends that the ALJ

failed to assign appropriate weight to the findings of Dr. Jones.  Mueller also argues

that the ALJ wrongly decided that his allegations were not credible.  Mueller claims

these two errors caused the ALJ to wrongly determine his residual functional

capacity.  Lastly, Mueller argues that the ALJ erred at step five of the analysis in

finding that he was capable of performing a significant number of jobs in the local

and national economy.

Mueller argues that the Commissioner should have found, at step three of the

analysis, that he satisfied a listed impairment, specifically §12.04[2]. That listing

provides that Mueller must satisfy the symptom requirements of §12.04A, as well

as, the functional limitation requirements of §12.04B, or Mueller must satisfy the

requirements of §12.04C.  Analyzing the record as a whole, substantial evidence

supports the ALJ's finding that Mueller does not satisfy §12.04.

While Mueller does not clearly state which of the specific disorders of §12.04

---

[1] This listing provides:

> Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

[2] Requires medically documented persistence, either continuous or intermittent, of:
A(1) Depressive Syndrome, A(2) Manic Syndrome, A(3) Bipolar Disorder or C(1) Chronic Affective Disorder

he would like to claim, his brief does state that he suffers from chronic affective disorder (§12.04C), bipolar disorder (§12.04A-2) and lists some of the symptoms contained in depressive syndrome (§12.04A-1). To meet or equal §12.04C, a Chronic Affective disorder, Mueller must demonstrate (1) a medically documented history of chronic affective disorder of at least two years duration which (2) has caused more than a minimal limitation of his ability to do basic work activities; and (3) one of the three listed functional limitations. Mueller fails to demonstrate that any affective disorder he claims had lasted for at least two years prior to the hearing. None of his medical records document any sort of psychological disorder starting on or before March 4, 2002. The first mention of any affective disorder occurred in Dr. Jones' report in September 2003, only six months before the hearing. Mueller fails to demonstrate that he met the symptom requirements of Chronic Affective disorder listed in §12.04C.

To meet or equal the requirements of §12.04A-1, a depressive syndrome, Mueller must show medically documented persistence, either continuous or intermittent, of four limitations listed under §12.04A-1.[3] While Mueller's brief does

---

[3]Those limitations include:
      a. Anhedonia or pervasive loss of interest in almost all activities; or
      b. Appetite disturbance with change in weight; or
      c. Sleep disturbance; or
      d. Psychomotor agitation or retardation; or

not cite any specific medical evidence in the record, he does state that he suffers from appetite disturbance, sleep disturbance, decreased energy, feelings of guilt or worthlessness and difficulty concentrating or thinking.  Dr. Jones' report did include four of these symptoms including anhedonia, difficulty in concentrating, feelings of guilt or worthlessness, and difficulty sleeping.

Mueller fails to demonstrate that he meets the requirements of §12.04A-1. While Dr. Jones' report does state that Mueller suffers from four symptoms of depression, there is no medical documentation of the persistence of these symptoms. Neither medical records from before his exam by Dr. Jones nor the later examination by Dr. Long, mention any symptoms of depression.  As there was no other documentation of Mueller's depression either from before or after his examination by Dr. Jones, Mueller's symptoms do not meet the persistence requirement of §12.04A-1.

Mueller claims that he has been determined to be bipolar and therefore meets the requirements of §12.04A-3 which requires "a history of episodic periods manifested by the full symptomatic picture of both manic and depressive

---

e. Decreased energy; or
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions or paranoid thinking;

syndromes." Mueller first received a diagnosis for bipolar disorder from Dr. Jones in September 2003. Dr. Jones' diagnosis was based on one interview with Mueller. She never treated him or provided care over any period of time. His treating physician, Dr. Rau, states that Mueller had been diagnosed with Bipolar disorder by Dr. Jones. Aside from the antidepressant medication that he had previously provided, Dr. Rau did not provide treatment for Bipolar disorder, and his notes indicated he could not adequately treat it.

Dr. Long's report did not find that Mueller suffered from bipolar disorder. Unlike Dr. Jones and Dr. Rau, Dr. Long engaged in objective psychological testing and provided functional findings with specific explanations for those findings. Substantial evidence supported the ALJ's finding that Mueller did not suffer from bipolar disorder. See Anderson v. Barnhart, 344 F.3d 809, 813 (8th Cir.2003) (noting deference afforded to a more thorough assessment of a one-time consulting physician than a treating physician); Ward v. Heckler, 786 F.2d 844, 846-47 (8th Cir.1986)(per curiam) (holding that a treating physician's conclusory opinions warranted less deference than the "detailed and thorough" reports of consulting physicians). Mueller does not meet the requirements in any of the subsections of §12.04A or §12.04C.

In addition, Mueller's claim of functional limitations under §12.04B is also not supported by the record. To satisfy §12.04B, Mueller must show that his symptoms lead to 'marked' functional restrictions. Neither Dr. Jones' nor Dr. Long's assessment of Mueller state that he has 'marked' restrictions. In fact, Dr. Long who wrote a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)," specifically did not assign Mueller a 'Marked' restriction in any category. The ALJ found that Mueller suffered from the mental limitations stated in Dr. Long's findings, specifically that Mueller suffers from "Moderate" restrictions in social functioning and "Slight" restrictions in his ability to concentrate. These restrictions do not rise to §12.04B's required level of severity.

Thus, since the substantial evidence of the record supports the finding that Mueller does not meet the requirements of §12.04, the ALJ's decision that Mueller did not satisfy a listed impairment under 20 C.F.R. pt. 404, subpt. P, app. 1 will stand.

Next, Mueller argues that the ALJ erred in determining his RFC, at step four of the analysis, because the ALJ failed to fully consider the evidence of the record. Residual functional capacity "is the most [a person] can still do despite [his] limitations." 20 C.F.R. §§404.1545, 416.945. This determination turns on "all of

the relevant medical and other evidence," including statements from the claimant. Id. This evidence includes: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and side effects of any medication the claimant takes to alleviate his or her pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of his or her pain or other symptoms; (6) any measures the claimant uses or has used to relieve his or her pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Polaski, 739 F.2d at 1321-22; 20 C.F.R. §§404.1529, 416.929.

Mueller argues that the ALJ did not properly consider the medical evidence from the two consultative examiners, Dr. Jones and Dr. Long. Mueller asserts that Dr. Jones' report, which stated that Mueller suffers from several psychological problems and had a GAF score which could be "consistent with a finding of disability," demonstrates that Mueller cannot do his previous relevant work experience. Dr. Jones described Mueller's ability to work as diminished, but did not describe how diminished his capacity was. The second consultative examiner, Dr. Long, performed an objective medical test, the MMPI-2, and found that while

Mueller had some limitations, he did not have any impairment which would severely limit his ability to work. These two opinions are not necessarily contradictory to each other, as both describe Mueller's ability to work as diminished. Nonetheless, the ALJ decided to give more weight to Dr. Long's findings. This is a proper consideration of the medical evidence as it is the ALJ's function to resolve conflicts among the opinions of various examining physicians. Jenkins, 76 F.3d at 233; Bentley, 52 F.3d at 785.

Mueller also seems to imply that both psychologists should be given equal weight as both were picked by the government and not Mueller. However, the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole. Bentley, 52 F.3d at 786. The only requirement the regulations require of the ALJ is to "always give good reasons" for the particular weight the ALJ chooses to give the opinion. Singh, 222 F.3d at 452; Prosch, 201 F.3d at 1013; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ stated several reasons for his decision to rely more heavily on Dr. Long's opinion rather than Dr. Jones'. First, the ALJ found Dr. Long's opinion to be a more detailed description of Mueller's ability than Dr. Jones'. Dr. Long's report provided a detailed assessment of Mueller's functional limitations, while the ALJ found Dr. Jones' description of 'diminished' to be too vague to base

an opinion on. The ALJ also found Dr. Long's methodology more objective and explainable than Dr. Jones'. Dr. Long performed both a clinical evaluation as well as a standardized MMPI-2 test. Dr. Jones's findings only included an evaluation and did not include an objective psychological test. The GAF score that Dr. Jones assigned had no explanation as to how that score was given.

The ALJ here explained his reasons for weighing the evidence as he did, and I find that his determinations are supported by the record. Even though Dr. Jones' opinion, if it had been granted controlling weight, might have supported a finding of disability, the ALJ's finding of no disability cannot be disturbed because other substantial evidence on record supports the ALJ's conclusion. An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion. Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir.1997) (citing Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir.1996)).

Mueller next argues that the ALJ erred in his credibility determination of Mueller's subjective complaints. The ALJ may disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997); Battles, 902 F.2d at 660. In considering subjective complaints, the ALJ

is required to consider the factors set out by <u>Polaski</u>, 739 F.2d at 1330, <u>See</u> <u>supra</u>.

Under <u>Polaski</u>, an ALJ may discount a claimant's subjective complaints when he explicitly finds them inconsistent with the daily activities of the claimant, lack of treatment, demeanor, and objective medical evidence. <u>Long v. Bowen</u>, 866 F.2d 1066 (8th Cir. 1989); <u>Jones v. Chater</u>, 86 F.3d 823, 826 (8th Cir. 1996).

The ALJ reviewed the evidence and found Mueller's subjective complaints of psychological disability to be inconsistent with the record as a whole. The ALJ concluded that although Mueller suffered from some psychological impairments, those impairments were not fully disabling. The ALJ gave several reasons for discrediting Mueller's testimony. First, the ALJ noted that Mueller's utilization of psychiatric treatment is not consistent with a psychological disability which would preclude all types of work. The ALJ noted that Mueller's treating physician, Dr. Rau, offered Mueller psychiatric treatment several times. However, while Mueller has sought hospitalization for his perceived physical ailments, he declined to accept any formal psychiatric treatment. Further, the ALJ noted that Mueller's use of psychiatric medication is not consistent with Mueller's complaints. Mueller was not taking any medication when he saw Dr. Jones. Further, when he saw Dr. Long, after he was diagnosed by Dr. Jones and given medication by Dr. Rau, Mueller was still not taking his psychiatric medication. The ALJ concluded that Mueller's failure

to take psychiatric medication or seek psychiatric treatment was a basis for discounting Mueller's subjective psychiatric complaints.

Mueller argues that using his failure to take psychiatric medication or seek psychiatric treatment against him is, in effect, using Mueller's disability against him. Mueller notes that even Dr. Long, who the ALJ assigned controlling weight, stated that someone with Mueller's disability does not have the ability to seek psychiatric care. Unfortunately, while this argument has some logical basis, Mueller does not cite any authority which would support this position, nor has the careful analysis of this court found any such authority. Instead the Eighth Circuit has repeatedly held that a failure on the part of the claimant to either take psychiatric medication or seek psychiatric treatment is a proper basis for discounting psychiatric complaints. See Roth v. Shalala, 45 F.3d 279, 283 (8th Cir. 1995) (failure to take psychiatric medication or seek psychiatric treatment is a basis for discounting psychiatric complaints); 222 F.3d 466 (8th Cir. 2000); Roberts v. Apfel 222 F.3d 466 (8th Cir. 2000) (absence of any evidence of ongoing counseling or psychiatric treatment disfavors a finding of disability).

Mueller further argues that the ALJ's finding that Mueller's appearance and demeanor at the hearing was inconsistent with a severe psychiatric impairment, also

uses his impairment against him. However, assessing the credibility of a claimant's testimony is primarily the ALJ's function. See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir.2003) (finding a claimant's credibility is primarily a matter for the ALJ to decide); Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir.2001) ( "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."). The only restraint the Eighth Circuit has placed on an ALJ who rejects subjective complaints is that they make an express credibility determination explaining the reasons for discrediting the complaints. Singh, 222 F.3d at 452.

The ALJ found Mueller's testimony to be "active, engaged, goal directed, manipulative and verbose" rather than "subdued, withdrawn or obviously depressed." This was consistent with Dr. Long's report. The ALJ also noted that while Mueller dramatically listed the things he could not do, he gave no reasons as to why he could not do them. The ALJ concluded that Mueller, rather than appearing as someone with a severe psychiatric disability, appeared as someone knowingly trying to impress the ALJ with his alleged disability. The ALJ also noted that Dr. Long had made similar observations in his clinical evaluation of Mueller. Further, Dr. Long's objective medical report stated that Mueller was not severely disabled. Because the ALJ explicitly discredited Mueller's testimony and gave good reasons to do so, I will defer to his judgement. Hogan v. Apfel, 239 F.3d 958,

962 (8th Cir. 2001).

Thus, since the substantial evidence of the record supports the ALJ's determination of Mueller's residual functional capacity, his decision that Mueller was capable of performing his past relevant work will stand.

Lastly Mueller argues that the ALJ erred at step five of the analysis in finding that he was capable of performing a significant number of jobs in the local and national economy.  This argument, however, is entirely dependent on his argument that the ALJ erred in finding that Mueller retained sufficient residual functional capacity to perform his past relevant work.  Under the five-step analysis of social security cases, when a claimant can perform past relevant work, he is not disabled. Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir.1996).

Considering the factors set forth in Polaski, 739 F.2d 1330, See supra, I find that the ALJ's determination of no disability is supported by substantial evidence in the record as a whole, and should therefore be upheld.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.

A separate judgment in accord with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this <u>22nd</u> day of September, 2006